[No. 2856.

### im Wilson *v.* The State.

Murder in the Second Degree—Penalty—Charge of the Court.— Imprisonment in the penitentiary for life is no part of the penalty for murder in the second degree; and a charge of the court to that effect is error, notwithstanding the penalty actually assessed by the jury was within the limits of the law.

Appeal from the District Court of Dallas. Tried below before the Hon. G. N. Aldredge.

The indictment charged the appellant with the murder of one Anderson Thomas, in Dallas county, Texas, March 22, 1883. The

conviction was for murder in the second degree, and the penalty imposed was a term of sixty-seven years.

Jim Lowe was the first witness sworn for the State. He testified that he gave a dance at his house on the night of March 22, 1883. Between eight and nine o'clock he started from his house to a saloon across the street, and met the defendant *en route.* As the defendant passed the witness he remarked: "By G—d, I am right!" Witness then requested him not to get up a. disturbance at the house, as all parties desired a nice time. The defendant passed on and entered the house. He met the deceased at the door and shoved him down. The deceased got up and asked the defendant: "What did you do that for?" The defendant then made a motion with his right hand and cut the deceased in the side, and then turned and left the room. The witness saw the blow, but did not see the knife. But one candle was burning in the room at the time of the cutting. Several parties were present, including William Humphries, who was standing at or near the door talking to a girl. Several parties were standing about outside, at the door and about it. The witness knew of no hard feeling between the deceased and the defendant, and was ignorant of any cause for the cutting. After he was cut, the deceased was taken to Atkins's drug store and died two days afterward. This all occurred in the city and county of Dallas and State of Texas.

William Humphries testified, for the State, that he was standing in the door of Jim Lowe's house on the night of the dance, talking to a girl, when the defendant, entering the room, met the deceased near the door and shoved him down. Rising, the deceased asked: "Why did you do that? I thought you were playing." The defendant thereupon struck him with a knife, inflicting a wound in the side and stomach, and turned and left the house. Witness did not see the knife in the defendant's hand, but as soon as he left the room the deceased said that he was cut, whereupon witness and others took him out of the house, and upon examination found him cut as stated. The deceased was then taken to Atkins's drug store and placed under the charge of Doctor Hamilton. He died about two days later. While the witness and others were examining the deceased outside the house, Lowe came up and asked: "What is the matter?"

Tom Nowland testified, for the State, that when the deceased was shoved down by the defendant, he fell across his, witness's,

feet. Defendant struck at the deceased as the latter arose, and the witness saw the glitter of the knife-blade. A dim light was burning in the room at the time. The witness was of opinion that Jim Lowe was in the room at the time.

Henry Crutchfield, for the State, testified that he was standing just outside of the door when the cutting occurred. He saw the defendant enter the door and push the deceased down. When the deceased got up he and the defendant clinched. The witness then saw a knife in the defendant's hand, and saw him strike at the deceased with it. The defendant and deceased both went out of the house, and the latter remarked that he was cut. Examination disclosed a bad cut in the side. Bony Gaston then took the deceased to Atkins's drug store. No words passed between the parties to the affray at the time. Witness knew of no hard feelings between the parties, and had never heard the defendant make threats against the deceased.

Bony Gaston testified, for the State, that while he was on the sidewalk, a few yards from Lowe's house, on the night of the cutting, the defendant passed him, knife in hand. He was "snapping" his knife as he passed the witness, and said: "By G—d, I am right!" The knife exhibited looks like the knife he had at that time. Witness saw the deceased after he was cut, and took him to Atkins's drug store.

Doctor Hamilton testified, for the State, that the deceased was brought to his office in Atkins's drug store for treatment, on the night of March 22, 1883. He was cut in the side, the wound being very deep and some six inches in length, and such a one as could have been made with the knife exhibited. The witness put back into the stomach of deceased a double handful of intestines which were protruding. While under the care of the witness the deceased said that he knew he would die, and that the defendant cut him.

Deputy Sheriff George McKenzie testified, for the State, that he arrested the defendant shortly after the cutting of the deceased, and took the knife exhibited from his person. It then had spots on the blade, which might have been blood.

Lee Thompson, for the defense, testified that he and the defendant went hunting on March 22, 1883, and the defendant cleaned ducks with the knife exhibited, which he owned.

In support of his defense of *alibi*, the defendant, by consent, introduced in evidence his application for a continuance, supported by his affidavit, alleging that by the two witnesses named

he could prove that he was at the Grand Windsor hotel at the time the deceased was cut.   One of these witnesses, alleged to be absent and by whom he could support this defense, was J. D. Crawford.

Miss Mary L. Min or testified, for the State, that she was employed in the office of Crawfords & Smith, a firm composed of W. L. and M. L. Crawford and L. F. Smith.   J. D. Crawford was a brother of W. L. and M. L. Crawford.   J. D. Crawford was not in Dallas during March, 1883.   Witness arrived at this conclusion from the fact that when in Dallas, J. D. Crawford frequented the office of Crawfords & Smith, and was not at that office during March, 1883.   Moreover, he drew drafts on Crawfords & Smith during that month, dated at New York, which drafts the witness entered upon the books of the firm.

S. E. McIlheny, head clerk at the Grand Windsor hotel, testified that J. D. Crawford usually boarded at the Grand Windsor hotel when in Dallas.   His name does not appear on the register for March, 1883.   Witness could not say positively that he was not in Dallas during March, 1883, as he sometimes stayed at the residence of M. L. Crawford.

The motion for new trial assailed the charge of the court, the action of the court in receiving evidence as to the whereabouts of the witness J. D. Crawford, and denounced the verdict as unsupported by the evidence

No brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE.   Wilson was convicted of murder of the second degree, his punishment being assessed at confinement in the penitentiary for sixty-seven years.   The learned judge below charged the jury that the punishment for murder of the second degree was not less than five years confinement in the penitentiary.

It appears from the record that the jury came into court and propounded to the court the following question:  "Judge Aldredge:  Your honor will please notify us the highest punishment the law allows for murder in the second degree."  To this his honor replied:  "Gentlemen of the jury:  In answer to the inquiry propounded by you, you are instructed that the highest

punishment for murder to the second degree is confinement in the State penitentiary for life."

Under the authority of the following cases this was error: *Burford* v. *The State*, 44 Texas, 525; *Searcy* v. *The State*, 1 Texas Court of Appeals, 440; *Allen* v. *The State*, Id., 514; *Garrett* v. *The State*, Id., 605; *Robinson* v. *The State*, 2 Texas Court of Appeals, 390; *Hamilton* v. *The State*, Id., 494; *Jones* v. *The State*, 7 Texas Court of Appeals, 338; *Collins* v. *The State*, 5 Texas Court of Appeals, 38.

From our knowledge of the learned judge who tried this case, we are satisfied that this was purely an oversight; for since he has occupied the bench, he has exhibited great familiarity with the provisions of the Codes.

For the error in the charge the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered June 28, 1883.